**Jean M. HAYES, Plaintiff,**

v.

**BLUE CROSS BLUE SHIELD OF MINNESOTA, INC., Defendant.**

**Civil No. 4–96–932(JRT/RLE).**

United States District Court, D. Minnesota.

June 8, 1998.

Michael J. Corbin, Karen Louise Dingle, Dingle Law Office, Minneapolis, MN, for Plaintiff.

William John Egan, Rider Bennett Egan & Arundel, Minneapolis, MN, for Defendant.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the Defendant's Motion for Summary Judgment.

A Hearing on the Motion was conducted on December 8, 1997, at which time, the Plaintiff appeared by Karen L. Dingle, Esq., and the Defendant, Blue Cross Blue Shield of Minnesota, Inc. ("Blue Cross"), appeared by William J. Egan, Esq.

For reasons which follow, we recommend that the Motion for Summary Judgment be granted.

### II. *Factual and Procedural History*

The Plaintiff, who is a resident of the State of Missouri, had been an employee of Blue Cross for ten years, working at its office in Eagan, Minnesota, until her employment was terminated in 1993. She began her employment when she was a high school student, as a part-time filing clerk in the general office. She soon obtained full-time employment at Blue Cross and has filled, over the years, a variety of positions, such as claims processor, adjustment clerk, and data entry clerk.

In 1988, the Plaintiff entered the billing department, where she eventually obtained the position of "membership services specialist." A membership services specialist is generally responsible for performing all membership processing functions, and is charged with the duty of assuring that customers' inquiries, and other needs, are resolved, and responded to, in a timely and accurate fashion. According to a job description, which the Defendant published in December of 1990: "Performance [of a membership services specialist] is measured by the ability to meet established production standards for quantity and quality and to provide help-ful and professional customer service." *Branom Depo.*, Ex. 4.

On February 11, 1989, the Plaintiff was diagnosed with Type I diabetes. This condition requires the Plaintiff to monitor her glucose levels, and to inject herself with insulin four times per day. When first diagnosed, the Plaintiff was hospitalized, and took a medical leave of absence until February 20, 1989. The Plaintiff's doctor advised her that, in addition to monitoring her blood-sugar levels, and taking periodic insulin injections, she should store food at her desk in case her glucose level should drop suddenly. Later, her physician instructed her not to work more than eight hours per day.

According to the Plaintiff, her diabetes has sometimes interfered with her ability to do her job. In particular, the Plaintiff has suffered periodic bouts of blurred vision. From 1989 until early 1992, the Plaintiff would occasionally experience obscured vision that had to be corrected with the use of magnifying glasses. The occurrences of diminished vision, which were the result of blood sugar fluctuations, ordinarily lasted for several weeks, after which the Plaintiff's vision would return to its normal state of 20/20. The Plaintiff maintains that a fluctuation in her blood sugar level can also diminish her ability to concentrate. The physical conditions associated with the Plaintiff's diabetes did not prevent her from performing any of the specific tasks that had been assigned to her, nor did the condition interfere with her ability to care for herself, or to perform any tasks outside of her employment.

Shortly after her return to work, the Plaintiff informed her manager, Donald Branom ("Branom"), of her medical condition, and of her need to keep certain supplies at her desk. She also apprised several of her colleagues, in the billing department, of her condition.

On August 1, 1990, over one year after the onset of the Plaintiff's diabetes, and its accompanying symptoms, the Plaintiff received a rave performance review from her then team leader, Mary Gallus ("Gallus"). Gallus remarked that the Plaintiff's performance had "improved tremendously during this past year." The Plaintiff was described as a "valuable asset" to her team, and was awarded a merit increase, of 8 percent, in her

salary. In August of 1991, her job performance was still rated as "very good" by another supervisor, Sandra Erchel ("Erchel").

In the fall of 1991, the Plaintiff became pregnant and, due to the frailty of her condition, which was caused by the taxing combination of pregnancy and diabetes, she went on leave from February of 1992, until her son's birth on April 17, 1992. Thereafter, the Plaintiff took maternity leave until June 26, 1992, as was allowed by the Defendant's medical policy. The Plaintiff wanted to stay at home longer, in order to look after her infant son, who suffered from certain medical complications. Nevertheless, she was instructed to return to work at the end of her maternity leave, in June.

From the time of onset of her diabetes, the Plaintiff was frequently absent from work, for medical reasons. She alleges that her supervisors, and her coworkers, verbally disparaged her because of her medical condition, her pregnancy, and her resulting absenteeism. Her supervisors, including Erchel, sometimes made "comments" about her leaving work such as: "You're gone more than you're here." Erchel also told the Plaintiff, during her pregnancy, that she, Erchel, should be pregnant, rather than the Plaintiff.

The Plaintiff has also testified that, sometime during 1989, she specifically asked Branom if she could be allowed to eat or drink at her desk, but that management issued a general memorandum to the staff which advised that no one would be allowed to eat at his or her desk. It is unknown when the memorandum was issued, but the Plaintiff believes that it could have been distributed during her last year of employment. One of the supervisors, whose identity the Plaintiff could not recall, informed the Plaintiff that, even if her blood sugar should drop, she would still be required to eat outside of her work area. Despite warnings that Blue Cross would not permit food to be consumed at the staffers' desks, the Plaintiff continued to eat at her desk, when needed, with the express permission of other unidentified supervisors, and she was never reprimanded for doing so.

In another incident, in either 1989 or 1990, the Plaintiff picked up the telephone, on the desk of another employee, in order to call her husband and request that he bring her a can of soda pop, because she was experiencing glucose depletion. A fellow employee, Tammy Gorman ("Gorman"), interrupted the Plaintiff's phone call, and explained to her that the Plaintiff should not be using that phone for personal affairs, because Gorman needed to use the telephone for a work-related call. The Plaintiff explained to Gorman it was an emergency phone call, caused by her low blood sugar, but Gorman insisted that she discontinue her use of the phone. The Plaintiff reported the incident to her manager, Branom, who met privately with Gorman so as to explain that the Plaintiff's phone call was for a medical emergency. According to the Plaintiff, she learned, from a subsequent conversation with Gorman, that Gorman had not understood the Plaintiff's reason for needing to make the phone call. Since that time, the Plaintiff has not had any difficulties with Gorman, attributable to the Plaintiff's medical condition.

The Plaintiff has also described an incident in which her medical condition was disclosed to a Blue Cross customer, and against her wishes. In 1989 or 1990, an employee, whose name the Plaintiff could not recall, told a customer that she had diabetes. Distraught over the disclosure, the Plaintiff immediately requested that the person not give out such information to the general public. There is no evidence that the unauthorized disclosure has ever reoccurred.

Further, the Plaintiff has testified that, at office parties, various members of her department would make off-hand, giggling remarks, which reminded the Plaintiff about her dietary restrictions. Often they would tell her that she should not consume a particular item when, in fact, her dietary regimen would allow it. Eventually, the Plaintiff stopped attending office parties because she grew tired of constantly having to explain to others the contours of the dietary restrictions that had been imposed by her diabetic condition.

When the Plaintiff returned to the billing department, from her pregnancy leave, much had changed. Sometime during the course of the Plaintiff's absence, Blue Cross implemented new auditing procedures for its mem-

bership service specialists.[1] During an audit, the employee's processing, and formal documentation of a customer's inquiry, would be reviewed for errors that would materially affect the customer's account. Gorman, who worked as a technical specialist, and who performed some of the audits, explained how the monthly audits were performed:

> The clerk would just pull [15] random pieces and copy them and give them to us. So, for example, she'd probably pull * * * five correspondence[s] and five group billings and five applications.

*Gorman Depo.* at 24.

The 15 audited documents were taken from periodic samples of a month's worth of work, in which a clerk would ordinarily process 70 items per day.

The auditors would look for both procedural and substantive errors. Inaccuracies, such as misspellings of customers' names, incorrect phone numbers, and erroneous calculations, were each marked as errors in the audit. Procedural flaws, such as the failure to microfilm a document after its completion, were also deemed to be an error. The error rate was then calculated by dividing the total number of errors by the number of pieces that were audited. Conversely, the "success rate" was the difference between 100%, and the calculated error rate. The acceptable rate of success was set at 94.1%.

Under the new policy, if a clerk's success rate fell below 94.1% for three consecutive months, then a progressive discipline plan would be triggered. The first step of the plan was to institute a 100% audit, in which every piece of the disciplined employee's work would be checked for errors. The employee, and his or her supervisor, would discuss the employee's progress at weekly meetings. If, after a series of warnings, the success rate did not return to an acceptable level, then the employee could be subject to discipline, including a termination of employment.

Upon the Plaintiff's return from her extended leave, she found that she had difficulty finding enough assignments to fill her time. During her absence, other employees had taken over her responsibilities, and the assignments needed to be reorganized after she returned. The restructuring of the department, in order to reintegrate the Plaintiff, was not accomplished overnight. As well, immediately upon her return from leave—and for reasons that are obscure—the new policy was explained to the Plaintiff, and she was told that she was being placed on 100% audit. Although Blue Cross disputes this assertion, there remains a genuine issue of fact as to whether 100% of the Plaintiff's work was audited, starting in July of 1992.[2]

In any case, during the summer of 1992, Kelly Anderson ("Anderson"), who had replaced Erchel as the Plaintiff's supervisor, had discussed management's growing dissatisfaction with the quality of the Plaintiff's work. The Plaintiff's supervisors believed that her work began to falter sometime before she took her leave of absence. In an attempt to raise the reliability, and accuracy, of the Plaintiff's customer documentation, Anderson lowered the quantity requirement of the Plaintiff's work so that she needed to process only five to 15 items per day. The two of them also met once a week in order to discuss the Plaintiff's progress in improving her proficiency.

In the first full month after the Plaintiff's return from leave, her success rate was calculated to be 93.34%, slightly below the threshold of adequacy. The following month, the Plaintiff's success rate fell to 82.3%. September proved to be equally subpar, as audits of her work revealed a success rate of 82.5%. On October 30, 1992, Anderson deliv-

---

**1.** There is evidence that the work of membership services specialists had been audited before 1992. In Gorman's deposition, parts of which were submitted by the Plaintiff for our review, she testified concerning audits of the Plaintiff's work from as early as May of 1991. *Gorman Depo.* at 44.

**2.** The Plaintiff testified that one of her supervisors, Kelly Anderson, told her that she was placed on 100% audit immediately after she returned, "because everybody was on it." *Hayes Depo.*, at 23. Gorman also testified that the Plaintiff had been on 100% audit since July, but that only one other employee, who was later dismissed, was on 100% audit. *Gorman Depo.* at 63–64. Erchel, who supervised the Plaintiff for only the first month after the Plaintiff's return to work, stated that the Plaintiff was not on 100% audit when she returned. *Erchel Depo.* at 69–70.

ered a verbal warning to the Plaintiff, which she confirmed in writing, that she had failed to meet the minimum success rate for three consecutive months, and that she would be allowed 30 days, from November 1, 1992, through December 1, 1992, in which to improve her accuracy, or face discipline. The memorandum further stated that all of the Plaintiff's work would be audited during this period. The Plaintiff acknowledged the memorandum by signing it.

Despite the warning, weekly progress meetings, and the relaxed quantity requirements, the Plaintiff managed only a success rate of 84% for the month of November. On December 7, 1992, Anderson issued another, more admonitory, written warning to the Plaintiff. The final paragraph of the memorandum read as follows:

> You will be given a three-week period (12/7–12/31) to achieve and maintain an expected level of quality. Your final success rate will be an average of all membership activity audited during this three-week period. Your work will be audited at 100%. If improvement is not made and maintained, continued progressive discipline including possible termination will occur.

*Memo from Anderson to Hayes of 12/7/92.*
The Plaintiff refused to sign this memorandum.

Over the next three weeks, the quality of the Plaintiff's work improved somewhat, but she still failed to satisfy the 94.1% hurdle, by scoring an average of 92.35%. Anderson, on January 15, 1993, issued another written warning to the Plaintiff, advising that the Plaintiff had still failed to achieve, and maintain, an acceptable level of quality. This memorandum concluded with the strongest warning to that date:

> We will continue to audit your work 100% for the next two weeks (1/18/93–1/29/93). We must see your overall success rate improve to the expected range or better. If we do not see this improvement, your employment at BCBSM will be terminated.

*Memo from Anderson to Hayes of 1/15/93.*
Again, the Plaintiff refused to sign the memorandum.

The Plaintiff then retained counsel, Theresa Ayling ("Ayling"), who, on Febru-

ary 11, 1993, wrote a letter to Anderson, which suggested that the Plaintiff's deficient performance was the result of on-the-job harassment, as well as her medical condition. Ayling requested a meeting so that they could discuss possible accommodations for the Plaintiff's diabetes, and her related impairments. Blue Cross temporarily suspended the progressive discipline process, and scheduled the requested meeting.

On March 3, 1993, the Plaintiff, and her attorney, met with Blue Cross Director of Human Resources Pat Manalo ("Manalo"), and Membership Department Head Pam Anderson. The Plaintiff requested the provision of a larger, anti-glare computer screen, a 10–inch keyboard, and magnifying glasses to accommodate her occasional lapses in visual acuity. All of these were provided, except for the magnifying glasses, which the Plaintiff already had acquired on her own, and the larger computer screen, which was not then offered by the manufacturer. In addition to providing other minor accommodations, such as training, Blue Cross reassured the Plaintiff that she was free to eat at her desk, take frequent breaks to use the bathroom, and could use the employee lounge to inject herself with insulin, if she desired more privacy. The Plaintiff's request for temporary disability parking was denied, however, until the Plaintiff could provide a note from a physician stating that such an accommodation was necessary.

The Plaintiff also requested that she be moved to another position, within Blue Cross, that would better suit her. Manalo agreed to inquire into the Plaintiff's qualification to serve as a PC specialist, for which there was an opening within the company. At the end of the meeting, the Plaintiff and Blue Cross agreed that the audits would continue for another month, in order to determine whether the quality of her performance improved on account of the new accommodations.

■ Despite these accommodations, over the next five weeks, the Plaintiff's performance remained unimproved. She managed success rates of 82%, 91%, 89%, and 87%, in March, and daily success rates ranging from 56% to 89% during the first week of April. During this period, the Plaintiff processed

less than 25 items per day, and often less than ten per day. On April 13, 1997, the Plaintiff managed a one day success rate of 100%, but that rate was based on a mere three items that were adequately processed. On April 15, 1993, the Plaintiff was advised that she would be dismissed from her employment at Blue Cross, effective April 29, 1993.[3]

On April 13, 1994, some 349 days after her termination, and 363 days after she received unequivocal notice of her termination, the Plaintiff filed a Charge of Discrimination with the Minnesota Department of Human Rights ("MDHR"). In that Charge, she claimed that Blue Cross discriminated against her on the basis of her disability, in violation of provisions of the Minnesota Human Rights Act, Minnesota Statutes Section 363.03, Subdivision 1(2)(b) and (c), by firing her after auditing all of her work for a period of nine months. The Plaintiff did not file a Complaint with the Equal Employment Opportunity Commission ("EEOC"), nor did she allege a violation of the Americans with Disabilities Act ("ADA"), Title 42 U.S.C. §§ 12101–12213, or mention any other Federal law, in her MDHR Charge. As a consequence, the MDHR did not cross-file the Charge with the EEOC, as part of the usual work share agreement between the two agencies. See, Minnesota Rules § 5000.0400.[4] Thus, as the Plaintiff concedes, the EEOC never considered any of her claims of discrimination.

On August 12, 1996, the MDHR, having reviewed the issues relating to her disability discrimination claim, declined to take legal action, and notified the Plaintiff of her right to file suit within 45 days. On September 23, 1996, the Plaintiff commenced this action, in which she alleges disability discrimination, in violation of the ADA, the MHRA, Minnesota Statutes Sections 363.01–363.14, pregnancy discrimination, in violation of the MHRA, breach of contract, and defamation. The Complaint also includes a claim for emotional distress, arising from the alleged violation of her statutory and common law rights. The Plaintiff invokes this Court's Federal question, and supplemental jurisdiction, pursuant to Title 28 U.S.C. §§ 1331 and 1367. As noted, we presently consider the Motion of Blue Cross for Summary Judgment.

### III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and we have found no triable issue. *Lower Brule Sioux Tribe v. State of South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

---

**3.** On May 10, 1993, the Plaintiff did interview for the position, at Blue Cross, as a PC Specialist. She was denied this position because she did not display a sincere interest in the job, had no understanding of what the position entailed, and did not have the right experience for the job.

**4.** Since Minnesota prohibits disability discrimination, and has established the Minnesota Department of Human Rights ("MDHR") to process disability discrimination complaints, Minnesota is considered to be a "deferral" State. See, Title 42 U.S.C. §§ 2000e-5(e)(1); 29 C.F.R. § 1601.74(a) (listing MDHR as designated State deferral agency). Therefore, the Plaintiff was obliged to first pursue relief with the MDHR, before filing any EEOC claim. Even when a claimant timely complains to the MDHR, she must also file a charge with the EEOC in order to preserve her right to assert a discrimination claim. *Hanenburg v. Principal Mutual Life Ins. Co.,* 118 F.3d 570, 573 (8th Cir.1997). The MDHR shortcuts this process by cross-filing with the EEOC, any charge it receives that "alleges a violation of the antidiscrimination laws administered by EEOC * * *." The Plaintiff's failure to allege a violation of the ADA prevented it from being cross-filed with the EEOC.

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, *Anderson v. Liberty Lobby, Inc.*, supra at 256, 106 S.Ct. 2505; *Ivy v. Kimbrough*, 115 F.3d 550, 551 (8th Cir.1997); *Thomas v. Runyon*, 108 F.3d 957, 959 (8th Cir.1997). Moreover, the movant is entitled to Summary Judgment where the non-moving party has failed "to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, supra at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop*, 141 F.3d 824, 825, 1998 WL 148844 *1 (8th Cir.1998); *Mayard v. Hopwood*, 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross*, 992 F.2d 162, 163 (8th Cir.1993).

Lastly, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence, [Courts] are particularly deferential to the non-moving party alleging discrimination." *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir.1996), citing *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994); see also, *Davis v. Fleming Cos.*, 55 F.3d 1369, 1371 (8th Cir.1995); *Oldham v. West*, 47 F.3d 985, 988 (8th Cir.1995); *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995); *Gill v. Reorganized Sch. Dist. R–6*, 32 F.3d 376, 378 (8th Cir.1994). This deference does not, however, obviate the nonmoving party's burden to establish a factual dispute on every essential element of her case, and a failure to do so will still result in Summary Judgment. *Snow v. Ridgeview Medical Center*, 128 F.3d 1201, 1205 (8th Cir.1997); *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir.1995).

### A. *Legal Analysis.*

**1.** *The Americans with Disabilities Act Claim.*

We first turn to Blue Cross' argument that the Plaintiff's ADA claim is barred because no charge of discrimination was ever filed with the EEOC.

**a.** *Standard of Review.* The ADA was enacted as a statutory remedy for individuals with disabilities, who experience discrimination in employment, and in other contexts. Title 42 U.S.C. §§ 12101(b)(1), 12112(a). By its terms, the ADA incorporates several of the "powers, remedies, and procedures" of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e–4, –5, –6, –8, –9, into its regulatory scheme. In order to pursue a claim of discrimination under the ADA, a plaintiff must exhaust her administrative remedies. *Tschida v. Ramsey County*, 927 F.Supp. 337, 340 (D.Minn. 1996). In this context, "[e]xhaustion requires that a timely charge of discrimination be filed with the EEOC," *id.* at 340, and the plaintiff must "receive, from the EEOC, a 'right to sue' letter." *Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir.1996); see also, Title 42 U.S.C. §§ 2000e–5(b), (c), (e); *Hanenburg v. Principal Mutual Life Ins. Co.*, 118 F.3d 570, 573 (8th Cir.1997) (Title VII case); *Osborn v. E.J. Brach, Inc.*, 864 F.Supp. 56, 58 (N.D.Ill.1994).

A plaintiff's opportunity to exhaust her administrative remedies, and to preserve her claims for a possible judicial determination, is not without limit. If the charge of discrimination is not filed with the EEOC, within 300 days of the date of the alleged discrimination, or within 30 days after receiving notice that a State or local agency has terminated enforcement proceedings, the claim becomes time-barred. See, *Braziel v. Loram Maintenance of Way, Inc.*, 943 F.Supp. 1083, 1092 n. 5 (D.Minn.1996); see also, *Dade v. Southwestern Bell Tel. Co.*, 942 F.Supp. 312, 318 (S.D.Tex.1996); *Layser v. Morrison*, 935 F.Supp. 562, 567 (E.D.Pa. 1995).

b. *Legal Analysis.* The Plaintiff, by her own admission, has failed to exhaust her administrative remedies by filing a discrimination charge with the EEOC. Having only mentioned disability discrimination under the MHRA, in her State-filed charge of discrimination, the cross-filing provision of the Minnesota Rules was not invoked. Thus, since both the 300–day and 30–day deadlines have long since passed, the Plaintiff's ADA claim is time-barred. The only unanswered question, as to this claim, is whether the claim should be dismissed on the basis of an absence of subject matter jurisdiction, or on the merits.

The timely filing of a charge within the 300– or 30–day period is not an essential requisite of the Court's subject matter jurisdiction, but is "a condition precedent and, 'like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" *Lawrence v. Cooper Communities, Inc.*, 132 F.3d 447, 451 (8th Cir.1998), quoting *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). A number of Courts have held that, while the limitations period may be subject to equitable tolling if a charge is filed late, the fact of filing a charge with the EEOC remains a jurisdictional prerequisite to the presentation of Title VII and ADA claims in Federal Court, notwithstanding the Supreme Court's decision in *Zipes*. See, *Sedlacek v. Hach*, 752 F.3d 333, 335 (8th Cir.1985) (dictum describing filing of charge as "jurisdictional prerequisite"); see also, *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 798 (10th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 342, 139 L.Ed.2d 266 (1997); *Davis v. North Carolina Dept. of Corr.*, 48 F.3d 134, 138 (4th Cir. 1995); *Ang v. Procter & Gamble Co.*, 932 F.2d 540 (6th Cir.1991).

These decisions—none of which mention *Zipes*—appear to minimize the breadth of the Supreme Court's holding in that decision, and rely heavily upon the Supreme Court's dicta, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1974), and other cases, which refers to the exhaustion requirement as "jurisdictional." A close reading of the *Zipes* decision

discloses that the Court sought to dispel any notion that Section 2000e–5(e) defines the bounds of the District Courts' jurisdiction. The Court explained that, despite its casual use of the term "jurisdictional" in certain earlier cases:

> More weighty inferences * * * are to be drawn from other cases. * * * [W]e noted that Congress had approved of the Court of Appeals cases that awarded relief to class members who had not exhausted administrative remedies before the EEOC. It is evident that in doing so, Congress necessarily adopted the view that the provision for filing charges with the EEOC should not be construed to erect a jurisdictional prerequisite to suit in the district court. * * * The reasoning of other cases assumes the filing requirement is not jurisdictional.

*Zipes v. Trans World Airlines, Inc.*, supra at 397, 102 S.Ct. 1127 [citations omitted].

Accordingly, in *Zipes*, the Supreme Court held that compliance with the limitations period was not a jurisdictional prerequisite to filing suit, and that exhaustion, itself, is not a jurisdictional prerequisite to suit.

The distinction is of little practical consequence to the Plaintiff who has failed to satisfy the condition precedent to relief under the ADA, even if she were able to avail herself of some means to equitably toll the limitations period. Here, equity cannot relieve her of the obligation to exhaust her administrative remedies as a condition precedent to obtaining relief in this Court. Put somewhat dogmatically, even if the Plaintiff had a meritable ADA claim, without an equitable justification to toll the limitations period, "it is unjust not to put the adversary on notice to defend within the period of limitation" and, in such situations, "the right to be free of stale claims comes to prevail over the right to prosecute them." *Order of RR Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 88 L.Ed. 788 (1944). Therefore, we recommend that Summary Judgment be issued in favor of the Defendant with respect to the Plaintiff's Federal disability discrimination claim, and we turn to the Plaintiff's State law claims.[5]

---

**5.** The Complaint expressly invokes only the Court's Federal question and supplemental juris-

diction. Our finding that the Plaintiff has not

2. *Minnesota Human Rights Act Disability Discrimination.*

Under the MHRA, it is an unfair employment practice for an employer to "discharge an employee" on the basis of the employee's disability, except where required by a *bona fide* occupational qualification. Minnesota Statutes Section 363.03, Subdivision 1(2)(b). A "disabled" person, so as to be qualified for protection under the MHRA, is any person who:

(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minnesota Statutes Section 363.01, Subdivision 13.

 a. *Standard of Review.* The Courts have generally interpreted the MHRA as an analog to the ADA, without substantive distinction between the two. See, *Miners v. Cargill Communications, Inc.,* 113 F.3d 820, 823 (8th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997); *Roberts By and Through Rodenberg–Roberts v. KinderCare Learning Centers, Inc.,* 86 F.3d 844, 846 n. 2 (8th Cir.1996). As a consequence, the burden shifting analysis, that was enunciated in *McDonnell Douglas Corp. v. Green,* supra at 802, 93 S.Ct. 1817, applies to claims under the MHRA. See, *Sigurdson v. Carl Bolander & Sons, Co.,* 532 N.W.2d 225, 227 (Minn. 1995); *Snow v. Ridgeview Medical Center,* supra at 1205–06.

 To establish a *prima facie* case of disability discrimination under the MHRA, a plaintiff must show: (1) that she is a disabled person within the meaning of the Act; (2) that she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that she suffered an adverse employment action under circumstances giving rise to an inference of disability discrimination. *Snow v. Ridgeview Medical Center,* supra at 1206; *Braziel v. Loram Maintenance of Way, Inc.,* supra at 1096. If the plaintiff can establish her *prima facie* case, then the burden of production shifts back to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Snow v. Ridgeview Medical Center,* supra at 1206. If the employer meets that burden, then, to be successful, the plaintiff must show that the employer's stated reason was a mere pretext for a discriminatorily motivated employment decision. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At all times, however, the plaintiff bears the ultimate burden of persuasion in establishing that her employer discharged her because of her disability. *Snow v. Ridgeview Medical Center,* supra at 1206.

 b. *Legal Analysis.* Blue Cross asserts that Summary Judgment on the Plaintiff's MHRA disability discrimination claims is appropriate because: (1) the Plaintiff cannot establish that she is disabled, and (2) there is no evidence that she suffered an adverse employment decision, because of her claimed disability.[6] Specifically, Blue Cross

exhausted her administrative remedies as to her only Federal claim, necessarily questions the propriety of exercising pendent jurisdiction over her State law claims. See, Title 28 U.S.C. § 1367(c); United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although diversity jurisdiction was not pled, the parties have complete diversity of citizenship. We will, therefore, address the merits of the State law claims, cf., Hanenburg v. Principal Mutual Life Ins. Co., 118 F.3d 570, 574 (8th Cir. 1997), since the Plaintiff would be allowed to amend her Complaint, in order to plead diversity jurisdiction, under Title 28 U.S.C. § 1332, if her State law claims survived Summary Judgment. Cf., Barlow v. Pep Boys, Inc., 625 F.Supp. 130, 133 (E.D.Pa.1985) (leave to amend should be freely given to allow plaintiff to cure technical jurisdictional defect), citing 5 Charles A. Wright

& Arthur R. Miller, Federal Practice and Procedure: Civil § 1214, at 106 (1969).

**6.** The Plaintiff also alleges that she was subject to harassment on the basis of her disability. Our review of the Record before us reveals only isolated, innocuous remarks, which only tangentially relate to the Plaintiff's condition, and which do not evince the requisite severity, or pervasiveness, to support a claim that the Plaintiff was subjected to a hostile work environment, or to support an inference that Blue Cross harbored a discriminatory intent in discharging her. The Plaintiff testified to occasional comments, from coworkers, about her dietary restrictions, as well as the accidental disclosure of her condition to a customer, all of which occurred no later than 1990—some three years before her termination of employment.

alleges that diabetes, in her case, did not substantially limit any of the Plaintiff's life activities. Blue Cross further argues that, even if her diabetes were disabling, it extended every reasonable accommodation that the Plaintiff requested, and yet the quality of her work showed no appreciable improvement. The Plaintiff counters that an impairment, which would substantially affect her life if she had not administered insulin, is still a disability, and that her poor work performance was the result of unfair treatment by her employer.

■ I. *Disability under the MHRA.* In attempting to establish that she is disabled, within the meaning of the MHRA, the Plaintiff argues that her diabetes, temporarily complicated by her pregnancy, materially limited her ability to perform the major life activities of working, eating, and seeing.[7] We conclude, however, that the Plaintiff has not produced evidence that would raise an issue of material fact that her impairments were sufficiently severe, and irremediable, to be considered substantial limitations on a major life activity.

Although the Minnesota Supreme Court has not squarely addressed the issue of disability discrimination in the workplace, under the MHRA, the Federal Courts of this District have provided guidance. To prove a hostile environment claim under the ADA, it must be shown that the employer created an objectively hostile work environment because of the plaintiff's disability, and a "mere offensive utterance" is insufficient to state a viable claim. *Wallin v. Minnesota Dep't of Corr.,* 974 F.Supp. 1234, 1243–44 (D.Minn.1997) (single deplorable comment about plaintiff's disability does not give rise to hostile environment claim). In *Hermeling v. Montgomery Ward & Co.,* 851 F.Supp. 1369 (D.Minn. 1994), the Court considered a disability discrimination claim under the MHRA, in which the disabled plaintiff was subjected to "numerous" derogatory remarks about his condition some eighteen months before he was terminated. The Court held that the comments, without a nexus to the termination, were insufficient to establish a *prima facie* case of disability discrimination. *Id.* at 1380–81.

Here, at most, the Plaintiff has produced evidence of some lack of sensitivity on the part of her fellow staff members, which appeared to have been rectified, with the help of her supervisor, long before she was disciplined. She has produced no evidence of harassment, or of any insensitive comments which occurred in 1992, or thereafter.

The Minnesota Supreme Court, when considering whether an individual's impairment renders her disabled, evaluates the limitations on major life activities through the prism of the individual's employability. In *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 110 (Minn.1989), the Court assessed a myriad of potential limitations on major life activities, by fusing them into the single question of whether those limitations affected the individual's ability to secure, retain, or advance, in employment. The Court reasoned as follows:

> The federal regulations define "substantially limits" as "the degree that the impairment affects employability. A handicapped individual who is likely to experience difficulty in securing, retaining, or advancing in employment would be considered substantially limited." 41 C.F.R. § 60–741, App. A (1987). * * * Looking at each individual case court must determine (a) the number and types of jobs from which the impaired individual is disqualified, (b) the geographic area to which the applicant has reasonable access, (c) the applicant's

7. In passing, the Plaintiff suggests that, even if she is not materially limited in a major life activity, Blue Cross regarded her as being so disabled. In this respect, the Plaintiff has established that several of her supervisors, and other staff members, knew of the Plaintiff's diabetic condition, and of some of the limitations that the condition had imposed upon her. An awareness of the Plaintiff's condition is necessary for Blue Cross to have regarded her as disabled but, in and of itself, that awareness is not sufficient. See, *Olson v. Dubuque Community School Dist.,* 137 F.3d 609, 612 (8th Cir.1998) (under ADA, employer's knowledge of employee's depression does not establish that it regarded her as disabled).

The "regarded as" disabled provision, at least in the ADA context, was intended to combat the effects of outmoded, "archaic attitudes," about persons who may still be considered disabled, even though the persons might be able to lead normal lives. See, *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279, 285, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In the absence of any evidence that Blue Cross regarded the Plaintiff as disabled, the Plaintiff's contention to the contrary is a make-weight argument, which does not satisfy the Plaintiff's burden to establish a factual issue concerning her disability.

own job expectations and training, (d) the criteria and qualifications generally, and (e) the types of jobs to which the rejection would apply.

*Id.* at 111 [citation omitted].

The Plaintiff has not produced any evidence that her diabetic condition significantly impeded her capacity to work. As recognized by the Minnesota Supreme Court, "[t]here is no dispute that diabetes is an impairment, and that working is a major life activity." *Sigurdson v. Carl Bolander & Sons, Inc.,* supra at 228, citing 28 C.F.R. Pt. 35.101 App. A, and 45 C.F.R. § 84.3(j)(2)(ii). Sigurdson instructs that, whether diabetes will support a claim of disability is a different question than whether the condition impacts upon one's professional life.

As to the disability prong of the *prima facie* case, *Sigurdson* bears close similarities to this action. In *Sigurdson,* an insulin-dependent diabetic applied for a position as a truck mechanic, and openly disclosed his medical condition during his job interview. *Id.* at 227. In his MHRA disability discrimination action, Sigurdson established that his diabetes affected his diet, which affected his health, and which, in turn, affected his ability to work. *Id.* at 228. Sigurdson, however, failed to produce evidence that his diabetes had materially limited his ability to obtain and retain employment. *Id.* at 229. The Minnesota Supreme Court held that the failure to obtain one job, even if it was because the claimant was a diabetic, did not give rise to a *prima facie* claim of disability discrimination under the MHRA. *Id.* The "failure to obtain one job" doctrine, that was enunciated

in *Sigurdson,* is neither novel, nor narrow. *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 110–112 (Minn.1989) (applicant rejected because his uncorrected vision was more than 20/100 was not limited in major life activity of working); *Fahey v. Avnet, Inc.,* 525 N.W.2d 568, 574 (Minn.App.1994) (inability to type does not limit major life activity of working); *Elbers v. Growe,* 502 N.W.2d 810, 815 (Minn.App.1993) (lack of "physical agility" did not limit major life activity of working), rev. denied (Minn., September 30, 1983).

Notably, the *Sigurdson* Court considered the claimant's insulin dependence, his dietary restrictions, and his other diabetic symptoms, which could be urged as substantial limitations on the claimant's major life activities, since they unquestionably affected the claimant's employment outlook. However these impairments may have affected Sigurdson's lifestyle, the Court found that those impacts did not have a material effect on his ability to retain and advance in employment, thereby defeating his MHRA disability claim.

The Plaintiff urges us to decline to follow the Minnesota Supreme Court's interpretation of the MHRA, as being unfaithful to the statutory text and purpose of the MHRA, and promotes the adoption of the EEOC's interpretive regulations, which maintain that an individual, who is afflicted with insulin-dependent diabetes is, *per se,* disabled under the ADA.[8] This, we cannot do. A State's highest court is the "final arbiter of what is state law," *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 236, 61

---

8. The Plaintiff invokes an EEOC interpretative guideline which states: "The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines * * *." 29 C.F.R. § 1630, App. § 1630.2(j). By way of an illustrative example, the guideline explains that "a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." *Id.* One Court in this District, interpreting the ADA, has refused, under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to defer to this EEOC guideline on the ground that it contravenes the plain language of the statute. See,

*Wilking v. County of Ramsey,* 983 F.Supp. 848, 854 (D.Minn.1997). Given the Minnesota Supreme Court's express holding, that insulin-dependent diabetes is not, without more, a disability, we need not consider the validity of the guideline, for it directly contravenes Minnesota law, as enunciated by the Minnesota Supreme Court. We would observe, however, that, given the number of persons who require corrective lenses in order to read, write, and work, this guideline could, if strictly applied, categorize vast segments of the American population as being disabled, thereby diluting the therapeutic effects of the MHRA in rectifying discrimination against the truly disabled. Nevertheless, in light of clear authority, from Minnesota's highest Court, we need not reach the full import of the EEOC guideline.

S.Ct. 179, 85 L.Ed. 139 (1940), and this Court could no more overrule the Minnesota Supreme Court on the meaning of the MHRA than we could countermand the United States Supreme Court's interpretation of Federal law. The Minnesota Supreme Court has spoken and, without more, insulin-dependence, with dietary restrictions, does not render one "disabled" within the meaning of the MHRA.

We are mindful that the Plaintiff has described a variety of symptoms which, undoubtedly, affect her daily activities. On a frequent to occasional basis, she suffers from fluctuating blood sugar, which can result in a number of transitory symptoms including occasional blurred vision, the ever-present risk of seizures, and the development of other complications. The Plaintiff claims that several of these symptoms interfere with her ability to concentrate on the job, and impact upon her job attendance. Indeed, even the treatment of diabetes has imposed adjustments in the Plaintiff's lifestyle, such as dietary restrictions, a regimen of insulin injections, and a strict, eight-hour workday.

None of these limitations, however, have prevented the Plaintiff from performing any of the specific tasks that were assigned to her in this, or in any other job. Assuming, *arguendo*, that the Plaintiff was discharged because of her medical condition, her evidence, when viewed in a light most favorable to her, does not establish that diabetes has "materially limited [her] ability to obtain and retain employment." *Sigurdson v. Carl Bolander & Sons, Co.*, supra at 229. In this regard, the Plaintiff testified that her diabetic condition would interfere with her job when she experienced periodic blurry vision. Nevertheless, she also stated that she obtained magnifying glasses to correct the problem, and that, in any case, she did not experience a single episode of blurred vision during the final year of her employment.

The Plaintiff also confirmed that her condition did not prevent her from doing any specific task, either in or out of work. Although she lived with dietary restrictions,

and the need for insulin injections, the Plaintiff has not presented any evidence that she is substantially impeded in securing, retaining or advancing in employment, generally. The Plaintiff ultimately found another position, as a medical claims processor, in January of 1994—following the only interview she conducted. Otherwise, there is a dearth of evidence that any of her conditions substantially impeded her efforts in finding work in any field of employment. Viewing these facts, in a light most favorable to the Plaintiff, she has not demonstrated that her diabetic condition substantially limited her ability to perform the essential functions of the job from which she was discharged—much less that she is unable to retain similar employment—or that she is substantially limited in any major life activity. As a consequence, she has failed to meet the "substantially limited" standard under Minnesota Statutes Section 363.03, Subdivision 1(2)(a).

ii. *A "Qualified" Individual.* Even if the Plaintiff had established the first element of her *prima facie* case, she would still be required to show that she was a "qualified disabled person." The MHRA defines a "qualified disabled person" as "a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question * * *." Minnesota Statutes Section 363.01, Subdivision 35. To determine whether a person is "qualified," under the ADA or MHRA, the Courts ask whether the individual meets the necessary prerequisites for the job, and whether she can perform the essential job functions, with or without reasonable accommodation. *Wilking v. County of Ramsey*, supra at 855.

Our review of the Record establishes that there is no genuine issue of material fact that the Plaintiff could not perform the essential functions of her position, by accurately and reliably processing customer account information, as a membership services specialist, even after all reasonable accommodations were provided.[9] The Record reflects that

---

9. For most of the time, during which 100 percent of her work was audited, the Plaintiff met weekly with her supervisor, and was given the opportunity to request assistance in meeting the applicable performance standards. She neglected to

request any of these accommodations, except to be allowed to work eight hours per day, until February of 1993, at which point she was already subject to termination under the pertinent performance policy.

every accommodation, which the Plaintiff had requested, but two, was provided by Blue Cross. She was not provided with a larger computer monitor, because the manufacturer of the monitor did not market one, and she was informed that she could only obtain a disabled parking space if she provided a doctor's note. There is nothing in the Record which suggests that the Plaintiff provided the doctor's note which would entitle her, or any other employee, to a parking spot for the disabled. Lastly, the human resources director attempted to relocate the Plaintiff, and she was given an opportunity to interview for another position within Blue Cross, but she did not satisfy the interviewer that she was qualified for that job. The Plaintiff has not shown that she was qualified, with reasonable accommodation, for any other available position within Blue Cross.

Accordingly, we find that the Plaintiff had been provided with all reasonable accommodations. "Reasonable accommodation" is defined, within the MHRA, as the "steps which must be taken to accommodate the known physical or mental limitations of a qualified disabled person." Minnesota Statutes Section 363.03, Subd. 1(6). As such, reasonable accommodation "may include but is not limited to, nor does it necessarily require: (a) making facilities readily accessible to and usable by disabled persons; and (b) job restructuring, modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, and the provision of aides on a temporary or periodic basis." *Id.* An accommodation is not reasonable, however, if it would impose an undue hardship on the operation of the affected business or organization. *Id.*[10] The only requested accommodation, that was met with a flat denial, was the Plaintiff's request for a larger computer monitor. The Record confirms that, at the time of the request, the manufacturer did not offer a larger monitor, and there is no evidence that a larger monitor, than that which had been already provided, could have been reasonably obtained.

Despite the accommodations which were provided, including a larger keyboard, training programs, and frequent breaks for insulin injections and for other needs, the Plaintiff's level of reliability remained unimproved, and unacceptable, as judged by Blue Cross's uniformly applied standards. We reject the Plaintiff's suggestion, that meeting the 94.1% rate of success was not an essential function of the job and, therefore, constituted an impermissible basis for her employment termination. It is not disputed, however, that timely and accurately responding to customer inquiries, as well as the processing of account information, was an essential function of her position. In fact, her job description expressly so provides, and the Plaintiff's interpretation of the MHRA would disallow, we think implausibly, the use of any standard to measure a disabled person's qualification to perform the essential functions of the position she holds, because the standard, as an evaluatory device, was not part of the job, itself.

The Plaintiff also disputes the fairness of requiring a 94.1 percent minimum success rate, when her work load was purposefully reduced in the hope of improving the quality of her work. As noted, the Plaintiff's workload was reduced first, in July of 1992, because of changes in the office structure which were necessitated by her long absence. Then the Plaintiff's output was further relaxed in order to improve her accuracy. The Plaintiff suggests, however, that, if the number of items processed and audited is lowered, then each individual mistake becomes proportionally more significant, thereby escalating her error rate. Nonetheless, as a pure

---

**10.** In determining whether an accommodation would impose an undue hardship, the factors to be considered include the following:

 1. the overall size of the business or organization with respect to number of employees or members and the number and type of facilities;
 2. the type of the operation, including the composition and structure of the work force, and the number of employees at the location where the employment would occur;

 3. the nature and cost of the needed accommodation;
 4. the reasonable ability to finance the accommodation at each site of business; and
 5. documented good faith efforts to explore less restrictive or less expensive alternatives, including consultation with the disabled person or with knowledgeable disabled persons or organizations.

Minnesota Statutes Section 363.03, Subdivision 1(6).

matter of statistics, reducing the Plaintiff's production rate would have as much effect in overstating her success rate, as in overstating her failure rate. The simple fact is that, notwithstanding a substantial reduction in the amount of work she was required to process, the Plaintiff's accuracy was unimproved. We find no unfairness, and a Jury could legitimately find none, in providing the Plaintiff with more time to do less work, with the expectation that the accuracy of her work would improve. Simply put, the Plaintiff's poor work performance was not the product of being rushed with more work than she could handle but, rather was the direct result of being unable to perform the work required, irrespective of any production quota. Such an inferior state of job performance, under any responsible appraisal, is antithetical to any expectation of job security. An employer need not accept a relentless inability to perform the essential functions of a job, or face the prospect of a disability discrimination claim, as the Minnesota Legislature expressly conditioned any such claim on the capacity of the job applicant, or employee, to acceptably perform the essential functions of the work involved which, here, the Plaintiff was not capable of adequately performing, even with reasonable accommodations.

### iii. *Circumstances that Raise a Reasonable Inference of Discrimination.*

Lastly, even assuming that the Plaintiff were an "otherwise qualified individual," she would still not be entitled to relief under the MHRA for, to avoid Summary Judgment, the Plaintiff must show that her discharge "occurred under circumstances that would raise a reasonable inference of discrimination." *Wilking v. County of Ramsey,* supra at 856, citing *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995). She has not done so here.

The Plaintiff contends that, upon her return from her extended leave, that was brought about by her pregnancy, her diabetes, and her son's illness, Blue Cross, by placing her on a 100 percent audit, had already started a progressive discipline process, even though she had previously received good performance reviews. According to the Plaintiff, she was being disciplined for

no documented reason, and from such a circumstance, one can reasonably infer a discriminatory motive. Assuming that the Plaintiff was placed on a 100 percent audit immediately upon her return from leave, in July of 1992, other undisputed facts leave no room for a reasonable inference that the imposition of the audits, and the subsequent termination, were adverse employment actions which were prompted by discriminatory motive.

First, the enhanced review of the Plaintiff's work was accompanied by a purposeful relaxation in the Plaintiff's workload. Second, since the Plaintiff's first official warning was given on October 30, 1992, and was followed by over five months of repeated warnings, and of close supervision of her work, the period, from July to October of 1992, does not appear to have been part of the progressive discipline process, and did not adversely affect the terms and conditions of her employment. Had the Plaintiff been subjected to spot-checks of 15 pieces of work per month, the October 30 warning, and initiation of the progressive discipline process, would have still ensued. To the extent that the Plaintiff suggests that Blue Cross began to question the quality of her work because of her diabetes, that suggestion is belied by the fact that, for two years after she was diagnosed with diabetes, and exhibited a high rate of absenteeism, the Plaintiff still was highly rated by her supervisors. The increased scrutiny of the Plaintiff's work coincided with an objectively measured decrease in the quality of her job performance. Blue Cross afforded the Plaintiff with an exhaustive remedial process, inclusive of every opportunity to voice her complaints, and, at the end of that process, Blue Cross was left with substantial proof that, with or without accommodation, the Plaintiff could not reliably fulfill her obligations as a membership services specialist. We may not responsibly second guess the judgment of Blue Cross without unnecessarily assuming the role of a super-personnel department. See, *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir.1995) ("[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fair-

ness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."). Here, we find no evidence of intentional discrimination which the MHRA was intended to correct.

### 3. The Claim of Pregnancy Discrimination under the MHRA.

██ The Plaintiff claims that, during her pregnancy in 1991 and 1992, she was subjected to unwelcome criticism, harassment, and abuse by Blue Cross employees. In her charge of discrimination, which was filed in 1994, the Plaintiff did not mention pregnancy discrimination. As a consequence, the Defendant contends that the Plaintiff's pregnancy discrimination claim is time-barred under the MHRA. We agree.

The MHRA requires a plaintiff to file an administrative charge of discrimination, or commence a lawsuit, within one year of the alleged discriminatory conduct. Minnesota Statutes Section 363.06, Subdivisions 1, 3. The Plaintiff first claimed to have been subjected to discrimination, on the basis of her pregnancy, on September 23, 1996—over three years after the date of her job termination, and more than four years after her pregnancy. It is beyond cavil that the Plaintiff cannot pursue this claim, if it was first raised in her Complaint.

██ Even assuming, for the sake of argument, that the Plaintiff could establish a colorable continuing violation of the MHRA, in the form of pregnancy discrimination, that violation could not have continued beyond the date of her termination, which occurred on April 29, 1993. See, *Costilla v. State*, 571 N.W.2d 587, 593 (Minn.App.1997) (plaintiff must show at least one act of harassment within limitations period), rev. denied (January 28, 1998). If we were to further assume, that the Plaintiff's MHRA claim of pregnancy discrimination was reasonably related to the claim of disability discrimination, which was raised in her administrative charge, such that it could be considered to have been raised on April 13, 1994, see, *Philipp v. ANR Freight System, Inc.*, 61 F.3d 669, 676 (8th Cir.1995), the limitations period, for these purposes, commenced no later than April 13, 1993—one year before the administrative charge was filed. Nevertheless, the Plaintiff

has not identified a single episode of pregnancy harassment, criticism, or abuse, as alluded to in her Complaint, that occurred during that period of time. Therefore, even if we were to stretch the bounds of the limitations period beyond any plausible limits, the alleged pregnancy discrimination would still fall outside of those boundaries. Accordingly, we recommend that the Plaintiff's MHRA claim, for disparate treatment on the basis of her pregnancy, be dismissed as barred by the one-year limitations period.

### 4. The Breach of Contract Claim.

The breach of contract claim may be addressed summarily, since she has abandoned that basis for requested relief. In her Complaint, the Plaintiff alleges that her relationship with Blue Cross was governed by the terms of an employee handbook and, later, it was controlled by the promises that Manolo made to provide certain accommodations. *Compl.* ¶ 29. She claims that the Defendant has breached these contracts, but she has failed to explain what terms of these "contracts" were not honored. In its Motion for Summary Judgment, Blue Cross has raised a number of substantive barriers to the Plaintiff's breach of contract claim. In response, the Plaintiff has advised that she will withdraw her breach of contract claim. Therefore, in the absence of any evidence offered to support the Plaintiff's breach of contract claim, Summary Judgment should be granted. See, *Celotex v. Catrett*, supra at 323, 106 S.Ct. 2548.

### 5. The Slander, Libel, and Defamation Claims.

██ The Complaint alleges that Blue Cross is liable to the Plaintiff for slander, libel, and defamation arising from Blue Cross's purported malicious publication of false information concerning the Plaintiff. This claim should be dismissed as well.

██ Under Minnesota law, an action for an intentional tort must be commenced within two years after the accrual of the claim, or it is statutorily barred. See, Minnesota Statutes Section 541.07(1); *Larson v. New Richland Care Center*, 538 N.W.2d 915, 920 (Minn.App.1995), rev. denied (March. 4,

1997); *McGovern v. Cargill, Inc.,* 463 N.W.2d 556, 558 (Minn.App.1990). Here, since the Plaintiff commenced this action on September 23, 1996, her defamation claim must have accrued after September 23, 1994, or it is statutorily barred. In Minnesota, an action for defamation accrues on the date of publication, and not when the statement is discovered. *Wild v. Rarig,* 302 Minn. 419, 449 & n. 21, 234 N.W.2d 775, 794 & n. 21 (1975) (per curiam), appeal dismissed, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976); *Benigni v. Town of Cotton,* 1997 WL 370547 *2 (Minn. App.1997), rev. denied (Sept. 3, 1997). The Plaintiff has never identified the allegedly defamatory statements, let alone the date of publication to any third person. All of the evidence, which the Plaintiff identifies in opposition to the Motion for Summary Judgment on this ground, predates the limitations period by, at least, one year. Therefore, her defamation claim is time-barred and should be dismissed.

■ 6. *The "Emotional Distress" Claim.* The Complaint also includes a generalized claim for emotional distress which, the Plaintiff explains, resulted from an intrusion upon her statutory and common law rights. While the emotional distress claim is ambiguous, as it has been phrased in her Complaint, the Plaintiff has disavowed any free standing claim for intentional or negligent infliction of emotional distress, and regards her Count VII to allege the existence of emotional distress, which is connected to her other claims. Of course, our recommendation of Summary Judgment on all her claims necessarily precludes the award of damages in any of her causes of action.

■ However, even if we were to indulgently construe her Count VII as asserting a claim for a negligent or an intentional infliction of emotional distress, it is clear that the Plaintiff could not prevail on any such claim. Under Minnesota law, to sustain a claim of intentional infliction of emotional distress, a plaintiff must prove the following four elements:

1. the challenged conduct must be extreme and outrageous;

2. the conduct must be intentional or reckless;

3. it must actually cause emotional distress; and

4. that distress must be severe.

*Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983); see also, *Schibursky v. IBM,* 820 F.Supp. 1169, 1183 (D.Minn.1993).

Importantly, a claim for the intentional infliction of emotional distress is governed by the two-year limitations period that generally applies to intentional torts. See, *Larson v. New Richland Care Center,* supra at 920. Therefore, the time for presenting a claim for intentional infliction of emotional distress, based upon the Plaintiff's treatment in the workplace, has long expired, prior to her Complaint, and is time-barred.

■ Under Minnesota law, a negligent infliction of emotional distress claim, which is governed by a six-year limitations period, requires the following showings:

1. a duty owed by the defendant to the plaintiff;

2. a breach of that duty;

3. some physical injury that has been caused by the defendant's breach; and

4. emotional distress which has been caused by the negligent act.

*Stadler v. Cross,* 295 N.W.2d 552, 553–53 (Minn.1980).

■ Where a plaintiff does not suffer contemporaneous physical injury, she may still prevail on a negligent infliction of emotional distress claim, if she can satisfy the requisites of the "zone of danger" doctrine. *Id.* at 554. The "zone of danger" doctrine provides that, in the absence of physical injury, the plaintiff must prove the following:

1. that she was placed in a "zone of danger" of imminent physical impact;

2. that she reasonably feared for her safety; and

3. that, as a consequence, she suffered severe emotional distress.

*Stadler v. Cross,* supra at 554; see also, *Bohdan v. Alltool Mfg., Co.,* 411 N.W.2d 902, 907 (Minn.App.1987), rev. denied (May 24, 1989).

Finally, Minnesota recognizes an additional exception to the physical injury requirement when the plaintiff seeks to recover "for mental anguish or suffering for a direct invasion of [her] rights, such as defamation, malicious prosecution, or other willful, wanton or malicious conduct." *Bohdan v. Alltool Mfg., Co.,* supra at 907.

The Plaintiff's allegations against Blue Cross, and its employees, do not suggest that their negligence has caused her injury, or that they somehow placed her in a "zone of danger" for imminent physical impact. As noted, the Plaintiff's other claims, for the direct invasion of her rights, fail as a matter of law, and, therefore, cannot support an award of damages for emotional distress.

In sum, viewing the Record as it applies to each of the Plaintiff's claims, in a light most favorable to her, the Plaintiff has failed to establish a genuine issue of material fact which would preclude the entry of Judgment as a matter of law, and, as a result, we recommend that the Motion for Summary Judgment be granted in all respects.

NOW, THEREFORE, It is—

RECOMMENDED:

That the Motion of the Defendant, Blue Cross Blue Shield of Minnesota, Inc. [Docket No. 11] be GRANTED.

### NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by **no later than June 25, 1998,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 25, 1998,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.